# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM JACKSON,                    )
                                    )
                    Plaintiff,    )      CIVIL ACTION NO. 3:08-220
                                    )
v.                                  )
                                    )      JUDGE KIM R. GIBSON
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
                    Defendant.    )

## MEMORANDUM OPINION

**Gibson, J.,**

      This matter comes before the Court on cross-motions for summary judgment based upon the administrative record: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 11) and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 13). The motions have been fully briefed and are now ripe for decision.

      Plaintiff William Jackson commenced the instant action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Plaintiff filed an application for DIB on January 6, 2004, alleging disability since May 25, 2001, due to major depression, post-traumatic stress disorder ("PTSD"), attention deficit disorder, a cognitive disorder, diabetes, high blood pressure, hearing loss, and obesity. (Administrative Record, hereinafter "R," 17, 71-77, 81, 334-42). His claim was denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 43-47, 48). A hearing was held on February 14, 2005, during which Plaintiff, who was represented by counsel, and a vocational expert ("VE"), appeared and testified. (R. 642-77). Plaintiff's application for DIB was denied on March 14, 2005, by decision of the ALJ. (R. 314-27). Plaintiff requested review by the Appeals Council. (R. 343).

      Before the Appeals Council made a decision on Plaintiff's claim, Plaintiff filed a second

application for DIB on April 1, 2005. (R. 347-75). Plaintiff was found disabled on initial determination of his second claim as of March 15, 2005, and entitled to benefits as of September 2005. (R. 330-33, 345-46).

The Appeals Council issued an order on March 9, 2006, vacating the ALJ's March 14, 2005, decision, reopening the favorable determination on Plaintiff's second DIB claim, consolidating the claims, and remanding Plaintiff's case for further development of the record, a hearing, and a new decision. (R. 340-42).

On April 30, 2007, a second hearing was held before the same ALJ, and Plaintiff, again represented by counsel, appeared and testified. (R. 678-708). By decision dated July 24, 2007, the ALJ denied Plaintiff's claim, finding Plaintiff was capable of performing a limited range of unskilled work at the medium exertional level and, therefore, was not entitled to DIB under the Act. (R. 17-28).

Plaintiff requested review of the ALJ's decision, and, on July 23, 2008, the Appeals Council denied his request, rendering the Commissioner's decision final under 42 U.S.C. § 405(g). (R. 7-9, 13). Administrative remedies thus being exhausted, the instant action requests judicial review of the ALJ's decision.

Plaintiff was born on March 27, 1949, and was fifty-two years old on the alleged onset date of disability, and fifty-eight years old at the time of the ALJ's final decision (R. 27). He graduated from high school and has twenty-seven years of past relevant work experience as an electronics salesman for Sears. (R. 82, 86, 205, 358). Plaintiff was also in the military, and served a tour of duty in Vietnam. (R. 72, 650). He has not engaged in substantial gainful activity since May 25, 2001. (R. 20).

Plaintiff attributes the cessation of his work activity with Sears on May 25, 2001, to his wrongful termination for accepting a check for purchases that exceeded the amount that he was authorized to take. (R. 82). He further stated, "[I] was not getting along with my manager so he was picking on me trying to find reasons to terminate me." (*Id.*). He explained in his testimony that the discord between his manager and him was the result of Plaintiff taking short-term disability prior to his termination for depression and PTSD. (R. 653-56). Following his termination, Plaintiff collected unemployment compensation for over a year. (R. 82).

2

Plaintiff was seen for an initial psychiatric evaluation on February 23, 2004, at the Veterans Affairs Medical Center ("VAMC") in Altoona, Pennsylvania.[1] (R. 125-28). Cecilia C. Levich, M.D. ("Dr. Levich"), diagnosed bipolar disorder, depression with history of psychosis, PTSD, dementia, and a history of alcoholism, and assessed a Global Assessment of Functioning ("GAF") score of 50.[2] (R. 127-28). During the evaluation, Plaintiff reported taking Paxil for over three years and that "it worked." (R. 125). Plaintiff reported being unemployed, and planned to retire the following month. (R. 126). Dr. Levich increased the dosage of Plaintiff's Paxil prescription. (R. 128).

On March 8, 2004, Plaintiff reported experiencing good moods and less depression, but complained of having trouble remembering things, being worried, and being easily distracted. (R. 308). He related that he still dreams about Vietnam. (Id.). Dr. Levich assigned a GAF score of 50. (Id.). On April 12, 2004, Plaintiff reported continued difficulty with concentration, and Dr. Levich again assigned a GAF of 50. (R. 299-300). On May 10, 2004, Dr. Levich noted slight memory loss, and indicated that Plaintiff's sleep was not restful due to dreams. (R. 297). Plaintiff's GAF was 50 at this appointment. (R. 298). Plaintiff's GAF at his May 19, 2004, appointment was likewise 50. (R. 297).

During Plaintiff's appointment on June 16, 2004, he reported that he had a potential job opportunity with the Post Office, and that he had been cutting grass on the side for money. (R. 295). Plaintiff's sleep was good, his memory was getting better, and his GAF was assessed at 52.[3] (R. 295-96). On July 19, 2004, Plaintiff reported being offered the Post Office job, and therefore did not have to pursue vocational rehabilitation. (R. 290). He indicated he had been sleeping well and had noticed an improvement in his memory. (Id.). He had been reading and playing cards as opposed

---

[1] Plaintiff's challenges to the sufficiency of the ALJ's decision are based solely on his mental impairments rather than his physical impairments, and the court will limit its recitation of the facts accordingly.

[2] The GAF scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-R) (4th ed. 2000). A score between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *Id.* (emphasis in original).

[3] A GAF score between 51 and 60 indicates some moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g. few friends, conflicts with peers or co-workers). *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-R) (4th ed. 2000) (emphasis in original).

3

to watching television. (*Id.*). His GAF was assessed at 54. (R. 291). Plaintiff's appointment on August 16, 2004, revealed that he did not get the job at the Post Office. (R. 288). He had been offered telemarketing positions, but turned them down because he cannot work in a confined area. (*Id.*). He continued to cut lawns, and had scheduled an appointment with vocational rehabilitation. (*Id.*). His GAF was 54. (R. 289).

On October 5, 2004, Plaintiff reported he was experiencing increasing difficulty with forgetting things and had been worrying a lot. (R. 279). Dr. Levich noted that he was not doing as well as he had been. (*Id.*). His GAF score was 50. (*Id.*). His November 17, 2004, visit revealed improved memory and sleep. (R. 272). Paxil had been working for Plaintiff. (*Id.*). His GAF was 50. (R. 273). On January 3, 2005, Plaintiff reported worrying less and improved attention. (R. 270-71). He was following up with vocational rehabilitation. (R. 271). His GAF score was 50. (*Id.*). On February 23, 2005, Plaintiff related that he had been experiencing less restful sleep and that he had been turned down by vocational rehabilitation. (R. 406). He reported occasional flashbacks. (*Id.*). His GAF was rated at 50 and Aricept was added to his prescription regimen of Paxil and Risperdal. (R. 407). On March 23, 2005, Plaintiff reported that the flashbacks had ceased, and that he had stopped taking Aricept and Risperdal. (R. 402). His GAF was 50 and he continued with his prescription for Paxil. (*Id.*). On April 20, 2005, Dr. Levich assessed Plaintiff's GAF at 50 and restarted him on Risperdal. (R. 519). At his May 18, 2005, appointment, Plaintiff complained of racing thoughts and increased forgetfulness. (R. 513). His GAF was again 50 and Dr. Levich planned to taper him off Paxil and start him on Wellbutrin as well Ritalin in addition to the Risperdal. (*Id.*).

Dr. Levich's June 6, 2005, treatment note indicated improvement with Wellbutrin, with Plaintiff reporting less thought racing and greater focus. (R. 512). His GAF was 50. (*Id.*). On July 5, 2005, Plaintiff reported better concentration, but occasional breakthrough anxiety and fear. (R. 510-11). His GAF was 50 and Risperdal was discontinued. (R. 211).

Plaintiff's treatment on August 5, 2005, revealed that Plaintiff had been having dry heaves and could not sleep and had been experiencing uncontrollable racing thoughts and excessive worrying. (R. 510). He had not been eating and was nervous all the time. (*Id.*). His GAF was assessed at 50 and Wellbutrin was discontinued and Paxil was started. (*Id.*). At a follow-up

4

appointment on August 12, 2005, Plaintiff reported going to the Emergency Room for nausea. (R. 503). His GAF was assessed at 50, Paxil was discontinued, Wellbutrin was restarted, and Ritalin was increased. (R. 504). On August 24, 2005, Dr. Levich noted that Plaintiff had lost thirty pounds in three months. (R. 502). His Wellbutrin was reduced, Ritalin was continued, and Paxil was restarted. (R. 503). His GAF was 50. (*Id.*).

Plaintiff presented to the VAMC clinic on August 26, 2005, for evaluation of his nausea and weight loss. (R. 500-501). The treating physician attributed Plaintiff's rapid weight loss to Ritalin, and prescribed phenergan for the nausea. (R. 501-02).

On September 7, 2005, Dr. Levich discontinued Plaintiff's Wellbutrin, reduced his Ritalin, and continued his Paxil. (R. 499-500). Plaintiff reported being more active, but still worrying more than he would like. (R. 500). His GAF was assessed at 50. (*Id.*). On September 21, 2005, Plaintiff was still worrying and having trouble concentrating at times, although Ritalin helped his thinking be more clear. (R. 498). His nausea was better controlled. (R. 499). Wellbutrin was reintroduced, Paxil and Ritalin continued, and his GAF was 50. (*Id.*). On October 17, 2005, Plaintiff reported better concentration and limited anxiety. (R.494). His medications were continued and his GAF score was 50. (R. 495).

Plaintiff related on November 7, 2005, that he had been doing more odd jobs for family and neighbors, and that he was attempting to get vocational rehabilitation again. (R. 493). His concentration and thinking were better, and he was not worrying as much. (*Id.*). Paxil and Ritalin were continued and his GAF was 50. (R. 494). On December 5, 2005, Plaintiff reported having better concentration to the point where he was able to read the newspaper. (R. 487). He was worrying less and becoming more active. (*Id.*). GAF was 50. (R. 188). Dr. Levich noted on January 11, 2006, that Plaintiff's memory was better and he was improving in his ability to complete tasks. (R. 485). His GAF remained 50. (R. 486). Plaintiff's treatment on February 8, 2006 revealed that Plaintiff had been reading short stories in *Reader's Digest*. (R. 484). His GAF was assessed at 50. (R. 485). On March 20, 2006, Plaintiff's concentration was good and he exhibited no symptoms of anxiety. (R. 483). His medications remained the same and his GAF was 50. (R. 484). On April 24, 2006, Plaintiff related that his concentration was better and he was reading more. (R. 479). He stated he played cards and Scrabble® with his daughter. (*Id.*). He was doing more work outside, and had

5

gone fishing. (*Id*.). His medication was unchanged, and his GAF was 50. (R. 480).

On May 22, 2006, Plaintiff reported working for a friend cutting grass and helping another individual cutting wood. (R. 622). His moods were good and he planned to go camping soon. (*Id*.). His GAF score was 50. (R. 623). On June 19, 2006, Dr. Levich reported that Plaintiff had no anxiety and less frustration. (R. 622). He had been spending a lot of time outside and went fishing again. (*Id*.). His GAF score remained 50. (*Id*.). Dr. Levich treated Plaintiff on July 17, 2006, and noted that he lost concentration once in a while, but that he had been handling frustration fairly well. (R. 621). GAF was assessed at 50. (*Id*.). On August 14, 2006, Plaintiff stated that he occasionally feels depressed and he does not like it, but the feeling is brief and goes away. (R. 620). He related that he had been going fishing a lot. (*Id*.). His GAF score was 50. (*Id*.).

Plaintiff's treatment on September 19, 2006, revealed good mood, good concentration, and no depression. (R. 619). Plaintiff was more motivated and was getting more grass cutting jobs. (*Id*.). He was thinking of getting a part-time job during the winter. (*Id*.). His GAF was 50. (*Id*.). Plaintiff's good concentration and absence of depression was again noted on October 23, 2006, and Plaintiff reported submitting an application for a part-time position at a sporting goods store. (R. 618). His GAF remained 50. (*Id*.). On November 20, 2006, Plaintiff related that he did not get the job in the sporting goods store, and that he had been turned down by vocational rehabilitation because he failed the test. (R. 617). His GAF was again 50. (*Id*.). Plaintiff reported on December 20, 2006, that he had been hunting for a couple of days, and that he was considering taking the vocational rehabilitation test again. (R. 616). His GAF was 50. (*Id*.).

On January 17, 2007, Plaintiff was getting busier and his concentration remained good. (R. 615). He had an upcoming appointment with vocational rehabilitation. (*Id*.). His GAF was assessed at 50. (*Id*.). Dr. Levich treated Plaintiff again on February 14, 2007, at which time Plaintiff reported he had been working a lot clearing snow from car lots. (R. 614). He had an upcoming appointment with vocational rehabilitation and was considering taking the test again because he was on Ritalin which improved his concentration and memory. (*Id*.). He was sleeping well. (*Id*.). His GAF was 50. (R. 615).

On March 14, 2007, Plaintiff had good concentration and was trying to read more. (R. 613). Once in a while, he would wake up with a very depressed feeling. (*Id*.). After taking Ritalin, the

6

feeling would go away. (*Id.*). He decided against taking the vocational rehabilitation test again. (*Id.*). His GAF remained 50. (R. 614). Dr. Levich treated Plaintiff on April 11, 2007, and noted that Plaintiff had difficulty organizing his time. (R. 612). When he is in a hurry, he forgets things. (*Id.*). Plaintiff related that he would be busy with landscaping work once the weather became warmer. (*Id.*). Dr. Levich assigned a GAF of 50. (R. 613).

Joseph A. Barrett, Ph.D. ("Dr. Barrett"), a state agency psychologist, completed a mental residual functional capacity assessment on March 22, 2004. (R. 203-06). Dr. Barrett found that Plaintiff was moderately limited in his ability to carry out detailed instructions and the ability to respond appropriately to changes in the work setting. (R. 203-04). "No evidence of limitation" or "no significant limitation" was assessed in the other categories of work related mental functioning that were evaluated. (*Id.*). Dr. Barrett noted that Plaintiff had a history of depression and PTSD. (R. 205). Dr. Barrett acknowledged Plaintiff's hospitalizations in 1976 and 1994, but stated his depression has been adequately controlled since. (*Id.*). Dr. Barrett recognized Plaintiff's work history and noted some return of symptoms, including issues with PTSD, since his termination from Sears. (*Id.*). Dr. Barrett reported Plaintiff reentered mental health treatment in January 2004. (*Id.*).

Plaintiff was pleasant and cooperative with a good mood and appropriate affect at intake. (*Id.*). He disclosed that he dreams of Vietnam but does not experience flashbacks and he did not want counseling. (*Id.*).

Dr. Barrett reported that Plaintiff is able to perform a range of basic activities of daily living and that he is capable of relating adequately if he continues to comply with treatment. (*Id.*). Dr. Barrett concluded that Plaintiff has the capacity to perform simple, routine tasks. (*Id.*).

Plaintiff underwent a consultative evaluation with Daniel Palmer, Ph.D. ("Dr. Palmer"), on June 28, 2005. (R. 436-42). Plaintiff acknowledged problems with social avoidance and crying episodes during periods of severe depression. (R. 436-37). Dr. Palmer noted Plaintiff's receptive speech functions were mildly impaired due to lapses in concentration, but that his expressive speech was clear, although Plaintiff did exhibit problems with word finding. (R. 438). He appeared clinically depressed and his affect was flat. (*Id.*). Dr. Palmer reported Plaintiff was functioning in the average to low average range of ability. (*Id.*). Plaintiff reported problems with day-to-day memory. (R. 439). Dr. Palmer observed his judgment and insight to be mildly impaired due to

7

psychiatric symptomatology. (*Id.*). Dr. Palmer diagnosed major depressive disorder, recurrent, moderate, PTSD, and cognitive disorder NOS related to concentration and short-term memory deficits, most probably related to somatic symptomatology. (*Id.*). Dr. Palmer evaluated Plaintiff's prognosis for positive change as poor, and questioned his capacity to process, retain, and implement directives, sustain attention to tasks, and tolerate stress in the working environment. (*Id.*). Dr. Palmer assessed Plaintiff's ability to carry out detailed instructions, make judgments on simple work-related decisions, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting as extremely limited due to his major depression, PTSD, deficits in concentration, and diabetes. (R. 441).

Dr. Palmer performed a second consultative evaluation of Plaintiff on May 31, 2006, in conjunction with Plaintiff's second application for benefits. (R. 525-30). Plaintiff reported episodes of seriously depressed mood and chronic problems with his sleep pattern. (R. 525). He related feelings of hopelessness, reduced motivation, and social avoidance. (*Id.*). He likewise acknowledged his difficulty with concentration functions. (*Id.*). Dr. Palmer noted Plaintiff's receptive speech functions appeared impaired due to lapses in concentration, but that his expressive speech was readily understandable. (R. 526-27). Plaintiff appeared clinically depressed and had a flat affect. (R. 527). Dr. Palmer stated that Plaintiff appeared to be functioning in the average range of ability. (*Id.*). Plaintiff's judgment and insight appeared mildly impaired due to psychiatric symptomatology. (*Id.*).

Dr. Palmer administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), and noted that the results were considered valid. (*Id.*). Dr. Palmer observed a significant elevation on Scale 2, indicative of depressive symptomatology. (*Id.*). A sub-clinical elevation on Scale 7 indicated mild anxiety. (R. 528).

Dr. Palmer diagnosed major depressive disorder, recurrent, moderate, PTSD, and cognitive disorder NOS related to concentration deficits. (R. 528). Plaintiff's prognosis for positive change was assessed as poor, due to medical complaints and chronic psychiatric symptomatology. (*Id.*). His capacity to process, retain, and implement directives, sustain attention to tasks, and tolerate stress in the working environment was questionable. (*Id.*).

Plaintiff's ability to understand, remember, and carry out detailed instructions and make judgments on simple work-related decisions was indicated as markedly limited. (R. 529). His ability

8

to respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting were given as extremely limited due to his major depression, PTSD, and deficits in concentration. (*Id.*).

A state agency medical consultant, Sharon Becker Tarter, Ph.D. ("Dr. Tarter"), completed a psychiatric review technique form on August 4, 2005. (R. 451-67). Dr. Tarter found that Plaintiff had a cognitive disorder NOS, major depressive disorder, PTSD, and a history of alcoholism. (R. 452, 454, 456, 459). Dr. Tarter further found that Plaintiff had a marked limitation in maintaining concentration, persistence, or pace and moderate limitations in restriction of activities of daily living and difficulties in maintaining social functioning. (R. 461). Dr. Tarter also noted marked limitation in Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 465). Dr. Tarter reported Plaintiff has problems with short-term memory, which are exasperated by stress. (R. 466). She concluded that Plaintiff would not be able to complete a normal workweek without his psychological symptoms being exasperated, and that he would be unable to adapt to changes in a work setting. (*Id.*). Dr. Tarter found Plaintiff's statements to be fully credible. (*Id.*). Dr. Tarter considered the report of Dr. Palmer and found it to be consistent with her assessment. (*Id.*). She gave Dr. Palmer's report great weight and adopted it in her assessment. (*Id.*). Dr. Tarter's concluded that the restrictions resulting from Plaintiff's impairments preclude him from being able to meet the basic mental demands of substantial gainful activity on a continuing basis. (*Id.*).

The ALJ sought the professional opinion of Rudolph Janosko, M.D. ("Dr. Janosko"), a psychiatrist, regarding the results of the MMPI-2 test administered to Plaintiff by Dr. Palmer on May 31, 2006. (R. 533-36). Responding to interrogatories by the ALJ, Dr. Janosko stated: "I am in agreement with Psychologist Daniel Palmer, Ph.D., as to his interpretation of [the results of the MMPI-2 scale profile]." (R. 535).

Plaintiff's activities of daily living include taking his daughter to school, doing some light housework, and preparing simple meals. (R. 388-89). He has a pill dispenser to remind him what pills to take and a calendar to remind him of his appointments. (R. 388). He occasionally attends baseball games or goes fishing with relatives or friends. (R. 389). Plaintiff drives his mother to her appointments. (R. 376). He plays card games with his family. (R. 380). Plaintiff will occasionally

9

read short stories in *Reader's Digest*. (R. 91). From time to time, he cuts neighbors' lawns for money. (R. 667, 670).

At the administrative hearing at February 14, 2005, Plaintiff testified that he began working at Sears in 1973 starting in the warehouse. (R. 651). He eventually made it to the selling floor, working in the electronics department. (R. 652). He was terminated on May 25, 2001, which he attributed to his taking short-term disability for depression and PTSD and his inability to focus and concentrate on the job when he returned. (R. 653-56).

Plaintiff testified that he is able to wake up, bathe and get dressed on an ordinary day. (R. 658). He can make simple meals, and sometimes drives 20 to 30 miles per day. (R. 658-59). He is able to do some work around the house. (R. 659-60). Plaintiff does not watch television very much or spend time on the computer, but he likes to read short stories in *Reader's Digest*. (R. 660-61). He is a member of the V.F.W. but he does not usually attend their functions. (R. 662). Plaintiff goes to restaurants every couple of weeks, and visits his mother and takes her places. (*Id.*).

Plaintiff testified that he sees a psychiatrist at the VA once a month for depression and PTSD. (R. 663). He has been trying to clear his thought process. (R. 664). He takes Risperidone, Paxil, and some vitamins. (*Id.*).

A vocational expert also testified at the administrative hearing on February 14, 2005. (R. 670-75). The vocational expert found that Plaintiff's past work experience as a retail salesperson was light work and semi-skilled, but if the individual were lifting televisions and similar things, it would be considered medium work. R. 671-72). The ALJ then asked the vocational expert to assume an individual of the same age, education, and work experience as Plaintiff, who was capable of medium work activity in which he would be limited to simple, routine, repetitive tasks, which are not performed in a production or quota based environment, which involve relatively simple work-related decisions, relatively few changes in the workplace, with no prolonged reading for content and comprehension. (R 672). The vocational expert testified that, given those limitations, Plaintiff could not return to his retail salesperson position because it is semi-skilled and would require more than simple, routine, repetitive tasks. (*Id.*). Furthermore, the vocational expert identified other jobs existing in significant number in the national economy that such a hypothetical individual could perform, which consisted of custodian, floor buffer person on the third shift, laundry laborer position,

10

bagger in a dry cleaner or laundry, warehouse support worker, table worker, and addresser/mail sorter. (R. 672-74). The vocational expert also testified that an employer would expect an individual to be on task seven to eight hours per day, and would not tolerate one to three absences per month or ten to fifteen absences per year. (R. 674).

At the administrative hearing on April 30, 2007, Plaintiff testified that Ritalin helps his concentration, which in turn has improved his depression. (R. 683). Plaintiff testified that he has difficulty multi-tasking, but can accomplish things if he does them one at a time. (*Id.*). Plaintiff does not like to be in big crowds. (R. 684). He can read the newspaper if he is taking Ritalin, but he is not able to read the longer articles or books. (R. 684-85). He forgets things, like appointments, if he does not write them down. (R. 685).

Plaintiff testified that he was turned down for a job with the Post Office because of his PTSD, and that he was turned down for vocational training through the VA because he was unable to pass the timed tests due to his problems with concentration and focusing. (R. 693-95).

The ALJ issued a written decision on July 24, 2007, which found that Plaintiff was not entitled to a period of disability or disability insurance benefits within the meaning of the Social Security Act (R 17-28). His request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (R 7-9). He subsequently filed this action.

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565,108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a

deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which

12

> the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Id.* at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the court's review is limited to the four corners of the ALJ's decision.

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). In order to be entitled to disability insurance under Title II, a claimant must additionally establish that his or her disability existed before the expiration of his or her insured status. 42 U.S.C. § 423(a), (c); *Matullo v. Bowen*, 926 F.2d 240, 244 (3rd Cir. 1990) (claimant is required to establish that he became disabled prior to

the expiration of his insured status); *see also* 20 C.F.R. § 404.131.  Plaintiff's insured status expired on December 31, 2006; therefore he must show that he became disabled on or prior to that date for purposes of entitlement to disability insurance.

Here, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2006, and that he has not engaged in substantial gainful activity since May 25, 2001, the alleged disability onset date (R. 20).  The ALJ then found that on and prior to December 31, 2006, Plaintiff had the severe impairments of major depressive disorder, PTSD, attention deficit disorder, a cognitive disorder, and a history of alcohol abuse. (*Id.*).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526) (R. 21).  The ALJ found that Plaintiff retained the residual functional capacity to perform simple, repetitive, routine work at the medium exertional level involving no more than simple work-related decisions and few work place changes with no prolonged reading for content or comprehension. (*Id.*).  At the fourth step, the ALJ found that Plaintiff is unable to return to his past relevant work (R. 26).  At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (R. 27-28).  The ALJ additionally determined that Plaintiff's statements concerning the intensity, duration, and limiting effects of his symptoms were not entirely credible (R. 23).

Plaintiff argues that the ALJ's decision is factually and legally inadequate because he rejected every medical opinion of record regarding Plaintiff's mental impairments, improperly substituted his own opinion for the medical evidence of record, and failed to credit Plaintiff's long work history in making his credibility determination.  The Commissioner's argument is that the ALJ's decision is supported by substantial evidence and therefore must be affirmed.

Plaintiff challenges the ALJ's evaluation of the records submitted by his treating psychiatrist, Dr. Levich, and asserts that the ALJ's rejection of Dr. Levich's findings contravenes the so-called "treating physician rule" recognized by the United States Court of Appeals for the Third Circuit.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"

14

*Morales v. Apfel*, 225 F.3d 310, 317 ((3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987). Where the opinion of a treating physician conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429). When choosing to reject a treating physician's opinion, "an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429). Where there is conflicting evidence, the ALJ must not only discuss evidence that supports his or her determination, but also explain the evidence that he or she rejects. *Cotter*, 642 F.2d at 705 (citing *Dobrowolsky*, 606 F.2d 403); *see also Wisniewski v. Comm'r of Soc. Sec.*, 210 Fed.Appx. 177 (3d Cir. 2006) (clarifying *Cotter*).

In this case, the ALJ afforded minimal weight to the opinion of Dr. Levich. Although the ALJ cites Dr. Levich's progress notes several times as support for his findings concluding Plaintiff is not totally disabled, the primary, if not sole, basis for his rejection of Dr. Levich's opinions is her consistent assessment of Plaintiff's GAF at 50. The ALJ notes that the GAF is a subjective scale, and that the score is indicative of an individual's functioning at that particular time or as the lowest level of functioning within the past week. (R. 25). The ALJ determined that Dr. Levich performed no psychological or psychiatric testing on Plaintiff, and based his assessment largely, if not entirely, on Plaintiff's subjective reports. (*Id.*). Additionally, the ALJ observes that Plaintiff has no recent inpatient hospital treatment for his mental condition which, apparently according to the ALJ, is incongruous with a GAF of 50. (*Id.*).

Initially, the court notes that the Social Security Administration has explicitly declined to endorse the use of the GAF scale because its scores do not have a direct correlation to the disability requirements and standards of the Act. *See* 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000). Low GAF scores may relate to factors unrelated to the ability to maintain gainful employment. "'[A] GAF score, without evidence that it impaired the ability to work, does not establish an impairment." *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D.Pa. May 21, 2008) (citing *Camp v. Barnhart*, 103 Fed.Appx. 352, 354 (10th Cir. 2004); quoting *Parsons v. Astrue*, 2008 WL 539060 *7 (N.D. Fl.,

15

Feb. 22, 2008)). Thus, the GAF scores are not necessarily indicative of Plaintiff's inability to work.

The court is mindful, however, that "GAF scores constitute medical evidence that is accepted and relied on by physicians, and that where an ALJ fails to explain why the scores have been discounted, a remand is necessary" *Cressman v. Astrue*, 2007 WL 2248832 at *2 (E.D.Pa. August 1, 2007). In *Cressman*, "the ALJ did not include any review of the GAF scores in her decision and thus failed to explain her apparent rejection of this medical evidence of serious impairment." *Id. See also Colon v. Barnhart*, 424 F.Supp.2d 805, 812 (E.D.Pa. 2006) (noting the GAF scale "constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability"); *Watson v. Astrue*, 2009 WL 678717 at *6 (E.D.Pa. March 13, 2009) (noting that case law provides that "remand is necessary when an ALJ fails to specifically discuss GAF scores"); *Escardille v. Barnhart*, 2003 WL 21499999 at *7 (E.D.Pa. Jun. 24, 2003) (case remanded because ALJ failed to mention claimant's GAF score of 50 which constituted specific medical finding that claimant is unable to perform competitive work).

The ALJ did not fail to address Plaintiff's GAF scores in this case, and he explained his reasons for discounting them. The issue, therefore, is whether substantial evidence supports the ALJ's rejection of Plaintiff's GAF scores. The ALJ's reasons for rejecting the GAF scores assigned by Dr. Levich were that the GAF is a subjective scale assessing an individual's level of functioning at a particular time and based on self-reported symptoms, that Dr. Levich performed no psychological or psychiatric testing on Plaintiff in assigning the scores, and that Plaintiff had no inpatient hospital treatment for his mental impairments during the period of time his GAF was assessed at 50. These mere observations fall far short of constituting the kind of contrary medical evidence required for an ALJ to reject the opinion of a claimant's treating source. An ALJ may reject the opinion of a physician only if it is contrary to other medical evidence contained in the record, *see, e.g., Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). As noted above, "an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429). The ALJ's rejection of Plaintiff's GAF scores is therefore not based upon substantial evidence.

16

Plaintiff next takes issue with the ALJ's rejection of the opinion offered by two time consultative examiner Dr. Palmer. The ALJ discredits Dr. Palmer's findings as being inconsistent with the totality of evidence in the record, including Dr. Palmer's own examination findings. Additionally, the ALJ notes that, in his own experience, Dr. Palmer routinely finds marked and extreme impairment of work-related functions. The ALJ further disagrees with Dr. Palmer's assessment of Plaintiff's scores on the MMPI-2. Finally, the ALJ observes that Dr. Palmer "possesses questions" about Plaintiff's ability to perform certain work-related tasks.

The ALJ determined that Dr. Palmer's findings of marked and extreme limitations of work-related functioning were belied by his mental status evaluation that revealed claimant to be "fully oriented with no evidence of looseness of associations, irrational processes, delusional activity, hallucinations or psychotic thought processes." (R. 25). The marked and extreme limitations found by Dr. Palmer were in the categories of understanding, remembering and carrying out detailed instructions, making judgments on simple work-related decisions, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. (R. 441, 529). The findings are not mutually exclusive. Limitations on the abilities evaluated are not dependent on a finding of looseness of associations, irrational processes, delusional activity, hallucinations or psychotic thought processes. The court therefore concludes that Dr. Palmer's findings are not internally inconsistent.

The ALJ determines that Dr. Palmer's notation of marked and extreme limitations is belied by the record evidence overall, specifically referring to Dr. Levich's progress notes that Plaintiff was experiencing good concentration with no flashbacks or other depressive symptomatology, that Plaintiff was teaching his daughter to drive, and engaging in work activity including mowing lawns, cutting wood, and plowing parking lots. (R. 26). The ALJ, however, fails to credit Dr. Levich's consistent assessment of Plaintiff's GAF at 50 in using this evidence to reject Dr. Palmer's findings. Furthermore, "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity." *Fargnoli*, 247 F.3d at 40, n. 5.

The ALJ's observation that he has "reviewed many such work-function opinions from Dr. Palmer and is hard-pressed to recall any ca[s]e in which Dr. Palmer did not opine the presence of 'marked' and 'extreme' impairment of work-related functions" (R. 25) is not evidence and cannot

be used as a proper basis for rejecting his findings or his opinion.

The ALJ also disagrees with Dr. Palmer's interpretation of Plaintiff's MMPI-2 scores. The ALJ disagrees with Dr. Palmer's finding of a significant elevation on Scale 2, stating that "[i]t is generally accepted that 'very elevated scores' of Scale 2 may signify serious clinical depression, while moderate or slight elevations tend to indicate a sullen attitude or dissatisfaction with one's lifestyle." (R. 26). However, as the ALJ acknowledges, Dr. Janosko, a psychiatrist, responding to interrogatories by the ALJ, stated: "I am in agreement with Psychologist Daniel Palmer, Ph.D. as to his interpretation of [the results of the MMPI-2 scale profile]." (R. 535).

An ALJ is not free to employ his own expertise against that of a qualified medical professional who has presented competent medical evidence. *Plummer*, 186 F.3d at 429. This principle is particularly acute in the area of mental impairments where clinical and examining sources are predicated on an additional level of expertise. *Morales*, 225 F.3d at 317-18, 19 ("the principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability."). The court thus concludes that the ALJ's rejection of Dr. Palmer's interpretation of Plaintiff's MMPI-2 results was error.

The ALJ's statement that "Dr. Palmer's own report states he 'possesses questions' regarding claimant's capacity to perform certain work-related tasks []. Such 'questions' are inconsistent with the certainty inherent in Dr. Palmer's opinion that the claimant has 'marked' and 'extreme' limitations in one-half of the work-related functions listed on the form." (R. 26). The ALJ's selective quoting of Dr. Palmer's report takes the phrase out of context thereby obfuscating the intent of its meaning. Dr. Palmer's statement in its entirety is:

> The prognosis for positive change in this case is deemed poor, related to the medical complaints, and the chronic psychiatric symptomatology. Given William's presentation and report I do possess questions regarding his capacity to accurately process, retain, and implement directives, to sustain attention to tasks, and to tolerate stressors in the environment. William can probably relate appropriately with others.

(R. 528).

The court finds that the ALJ's perception of Dr. Palmer's lack of certainty is unfounded. Moreover, an ALJ may only reject a medical opinion based upon contrary medical evidence, not on semantics. *See, e.g., Frankenfield*, 861 F.2d at 408.

Plaintiff further argues that the ALJ did not address the opinion of consultative examiner Dr. Tarter. Dr. Tarter completed a psychiatric review technique form on August 4, 2005. She found, *inter alia*, that Plaintiff had marked limitations in maintaining concentration, persistence or pace and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 461, 465). Furthermore, she determined that Plaintiff's statements were fully credible and she adopted Dr. Palmer's assessment as part of her evaluation. (R. 466). Dr. Tarter concluded that Plaintiff could not adapt to changes in the work setting and that the restrictions resulting from the impairment would preclude Plaintiff from engaging in competitive work activity on a sustained basis. (*Id.*). The ALJ's failure to address Dr. Tarter's opinion was error. *See Fargnoli*, 247 F.3d at 42-43 (although an ALJ may weigh conflicting medical and other evidence, he or she must give some indication of the evidence that he or she rejects and explain the reasons for discounting the evidence; where an ALJ failed to mention significant contradictory evidence or findings, the court was left to wonder whether he considered and rejected them, or failed to consider them at all, giving the court "little choice but to remand for a comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this circuit. . . ."); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) ("In making a residual functional capacity determination, the ALJ must consider all evidence before him. . . . Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. . . . 'In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.' *Cotter*, 642 F.2d at 705.") (additional citations omitted).

Plaintiff contends that the ALJ failed to adequately consider his long work history in making his adverse credibility determination. A strong and consistent work record is an important factor in assessing credibility as to pain and inability to work. *Dobrowolsky v. Califano*, 606 F.2d 403, 409-10 (3d Cir. 1979). Indeed, "when the claimant has a work record like [plaintiff's] twenty-nine years of continuous work, fifteen with the same employer his testimony as to his capabilities is entitled to substantial credibility." *Id.* at 409. In the case presently before the court, Plaintiff has a twenty-seven year work history, all with the same employer, after his military service which included a tour of duty

in Vietnam. Inexplicably, however, in making his adverse credibility determination, the ALJ merely states "the Administrative Law Judge has examined the claimant's work record and notes that the claimant has a fairly consistent work history." (R. 24). This was error. While credibility determinations are the province of the ALJ, the court finds that a more detailed explanation of why Plaintiff's work history did not entitle him to enhanced credibility is warranted. It is, at the very least, deserving of more than one sentence.

Having determined that a remand is appropriate, the Court must address Plaintiff's argument concerning the alleged bias of the ALJ. (Document No. 12, pp. 29-32). On September 4, 2008, about a month and a half after the issuance of the ALJ's decision denying Plaintiff's claim for DIB benefits, National Public Radio's "Marketplace" featured a story about the highly-publicized backlog of Social Security disability cases and the resulting delays experienced by claimants with respect to the processing of their claims. Disability claimants wait . . . and wait, http://marketplace/publicradio.org/display/web/2008/09/04/ss_backlog/ (as visited on January 14, 2010). The ALJ responded on September 6, 2008, by submitting a comment that was critical of the Commissioner for attributing the backlog to inefficient administrative law judges.[4] *Id.* The crux of

---

[4]In fairness to the ALJ, the Court deems it appropriate to quote the entirety of his posted comment, and not just the portion quoted in Plaintiff's brief. (Document No. 12, p. 30). In his comment, the ALJ stated as follows:

I am a Marine combat veteran of Vietnam and I have been a lawyer for more than 23 years. I have represented clients ranging from small corporations to an elected official facing removal for poor decisions, to indigent parents whose children were removed by state authorities, to families torn by a divorce, to auto accident victims and injured workers seeking workers compensation benefits, to criminal defendants. In none of these arenas have I seen more abuse of the legal process than in my last 4 years as a Social Security disability judge. It is a rather classical example of a well-intentioned government program to assist the weakest members of our society transformed into a cash-cow for the avaricious among us. Occasionally--but rarely--do I see a claimant with an entirely fraudulent claim. The clear majority of the claimants who appear before me do have some physical or mental impairment. The real issue is whether that person can meet the definition of "disability" which was intentionally set very high by Congress to provide income to only those whose injuries/illnesses are very debilitating. Unfortunately, that very high bar is approached with deception and falsification in many cases. Some doctors go overboard on diagnoses and treatment because they sense the "pot of gold" in having a fairly young patient (on Medicare for many years to come) with a reliable source of payment for constant treatment. Lawyers and other non-attorney representative [sic] can receive fees as a percentage of the back benefits awarded to a claimant. Once a claimant has a legal representative, one can actually track how the alleged impairments become much worse, with new impairments and symptoms added as the case matures. A judge with some experience can almost recite verbatim the same story we hear from virtually EVERY claimant, suggesting they have received training from the national organization of the claimant's attorneys. The government is complicit in this boondoggle, because the Social Security Administration

the ALJ's comment was that the SSA had frequently been presented with meritless claims, resulting

---

actually publishes lists of symptoms for various impairments in the form of rules for judges to follow. Is it any wonder we hear those lists of symptoms at almost every hearing? For 15 of the past 16 years congress [sic] has funded the Social Security disability program at amounts below the amount requested by the president [sic]. In the past few years, the growing backlog has been discovered by the mainstream media and suddenly there is a major push to eliminate the backlog. Not a moment too soon, as we are seeing the advance wave of the "baby boomer" generation, those who claim early disability to avoid waiting for their statutory retirement age to come up. Judge Haberman was correct, and Commissioner Astrue was not completely candid in his statement that he doesn't tell judges which way to decide a case. SSA places enormous pressure on the judges to eliminate the backlog by granting benefits to as many claimants as possible. Certainly not by direct means, but by many, many indirect means. Because a judge who denies a claim must provide an extensive explanation for the reasons (and nearly every claimant alleges the symptoms embodied in the published SSA rules) a denial Decision is much more complicated and time-consuming to write, taking 2 to 3 times as long as Decision [sic] granting benefits. Yet at one point, Mr. Astrue was threatening job action against any judge who did not meet an arbitrary number of dispositions per year. Mr. Astrue has been a lawyer for a long time; he must certainly be aware that congress [sic] created administrative judges in the Social Security Act and in the Administrative Procedures Act. In those laws, congress [sic] specifically forbid [sic] administrative agencies (such as SSA) from taking any action against administrative judges on the grounds of their decisions or acts of judicial discretion in managing cases. Just as the framers of the U.S. Constitution divided political powers into three branches to prevent the "political passions of the day" from taking this government down unwise paths, the congress [sic] created a form of "separation of powers" between the government agencies and their own administrative judges. Mr. Astrue knows that, but because of the political pressure on him to eliminate the backlog, he is blaming everything on the administrative judges, and deliberately attempting to circumvent the controls congress [sic] emplaced for exactly such political circumstances as these at present. Unfortunately, as in most political controversies, Truth is the first casualty. Mr. Astrue speaks loudly and often about the judge who "hasn't held a hearing in X years" or about the "judges who dispose of 40 cases per year." Unfortunately, Mr. Astrue refuses to identify those persons (purportedly because of "privacy issues") and there may be valid reasons for such situations. For example, judges who are appointed to management positions in this agency are still counted as "judges" even though they may do few–if any–hearings. Judges who are union officials may be involved in extensive litigation against the agency (enforcing the intent of congress [sic] against agency behavior) and may spend relatively [sic] time disposing of disability cases. We can only speculate because Mr. Astrue will not provide the necessary information to back up his accusations. Finally, some truth may be discovered by congress [sic] itself. The General Accountability Office (an investigative agency of congress [sic]) was tasked to look into the performance of the SS disability program. The conclusion was that there were some judges who were less productive, but that it is impossible to tell why, because the cases vary to the extreme in the number of issues which must be considered and decided by the judge. An extremely difficult case would naturally take much longer than a relatively routine case. The one GAO finding Mr. Astrud [sic] doesn't want the public to hear is that the GAO found the chief reason for the backlog is agency mismanagement "for decades" and that the SSA is still using business practices which were discredited as ineffective "years ago." That may be the real reason Mr. Astrue wishes to place the blame on the administrative judges.

Disability claimants wait . . . and wait, http://marketplace.publicradio.org/display/web/2008/09/04ss_backlog/ (as visited on January 14, 2010).

in the need for administrative law judges to prepare detailed opinions explaining the reasons for denying such claims. *Id.* He criticized the Commissioner for pressuring administrative law judges to prepare more opinions each year. *Id.* The ALJ intimated that since decisions granting applications for benefits were easier to prepare than decisions denying applications for benefits, the Commissioner's request for an increase in productivity was really a subtle or implicit call for administrative law judges to award benefits in more cases in order to eliminate the backlog. *Id.* In an attempt to emphasize why he believed the claims brought by many applicants to be meritless, the ALJ stated that virtually every claimant would describe specific symptoms published by the SSA in attempting to receive an award of benefits. *Id.*

Plaintiff argues that the ALJ's comment evinces a predisposition to deny claims brought by individuals seeking Social Security disability benefits, thereby rendering the ALJ's participation in Plaintiff's case a violation of the Due Process Clause of the Fifth Amendment. (Document No. 12, p. 31).

The United States Court of Appeals for the Third Circuit has recognized that, upon a showing of bias on the part of an administrative law judge, a remand for further proceedings may be warranted even if the Commissioner's administrative decision is "supported by substantial evidence" for purposes of § 405(g). *Hummel v. Heckler*, 736 F.2d 91, 95 (3d Cir. 1984). In this case, that issue need not be addressed, since the Court has already concluded that a remand is required for other reasons. The only remaining question is whether *Ventura v. Shalala*, 55 F.3d 900, 904-905 (3d Cir. 1995), entitles Plaintiff to a hearing before a different administrative law judge. The Court answers that question in the negative. Unlike the situation in *Ventura*, in which the Court of Appeals was presented with evidence of actual bias, Plaintiff cannot show that the ALJ is biased against him. A careful reading of the hearing transcript reveals that the ALJ was polite to Plaintiff throughout the hearing. Upon learning that Plaintiff was a Vietnam veteran at the original hearing, the ALJ shared some of his experiences as a Vietnam veteran with Plaintiff. (R. 654). Furthermore, during the second hearing, the ALJ specifically took time to try to comfort Plaintiff regarding the misgivings

he was having concerning some of his experiences in Vietnam.[5] (R. 695-703). The ALJ even went so far as to remind Plaintiff that he had the ALJ's name and number if he needed someone to talk to about his Vietnam experiences. (R. 700).

The statements contained in the comment submitted by the ALJ in response to the segment of "Marketplace" dedicated to the Social Security backlog did not evince a bias against Plaintiff in particular or against Social Security claimants in general. The statements, when read in context, were more critical of the Commissioner than they were of Social Security claimants. The remarks made by the ALJ concerning the advocacy of claimants and their representatives merely constituted a recognition that while many claimants had physical or mental impairments, only a small subset of such claimants were actually "disabled" within the meaning of the Act. *Luu v. Astrue*, Civil Action No. 09-60, 2009 WL 2462571, at *4, 2009 U.S. Dist. LEXIS 70365, at *12-13 (W.D.Pa. August 10, 2009). Thus, the Due Process Clause does not require the transfer of Plaintiff's case to a different administrative law judge. It is the prerogative of the Commissioner to determine how this matter will be handled on remand. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

As the Supreme Court recently recognized in *Caperton v. A.T. Massey Coal Co., Inc.*, 129 S.Ct. 2252, 2259 (2009), policy considerations sometimes warrant judicial disqualification under circumstances in which such disqualification is not constitutionally required. The rejection of medical evidence by a judge during the course of a judicial proceeding is generally not regarded as a legitimate basis for seeking that judge's recusal in a later judicial proceeding involving the same party. *Meng v. Schwartz*, 97 F.Supp.2d 56, 57 (D.D.C. 2000). Nevertheless, if Plaintiff believes that the ALJ's rejection of the opinions of the treating psychiatrist, the consultative examiner, the Agency's DDS reviewing physician, and the Medical Expert in favor of his personal interpretation of medical evidence indicate that the ALJ is prejudiced against him, he is free to seek his recusal in the event that he is reassigned to his case on remand. 20 C.F.R. §§ 404.940, 416.1440. An administrative law judge's refusal to recuse himself or herself from deciding a particular case is

---

[5] "Okay, all right, let me just add one thing to you. Okay, I need to ask you a couple other questions too, but, hey, you know, God decides who lives and dies on the battlefield. You have an opportunity to intervene and to help but you don't decide that. It's not something that you did or didn't do. . . . Okay, so I got to tell you there is nothing that you did or didn't do that either made somebody die or made somebody live. You helped, okay, you made a difference in circumstances but nothing that you did or didn't do lead to anybody dying. I need you to know that." (R. 695-96). The ALJ went on to further assure Plaintiff in like manner and tone for eight pages of the hearing transcript. (R. 695-703).

subject to Appeals Council review under the Commissioner's regulations and to judicial review pursuant to § 405(g). *Grant v. Shalala*, 989 F.2d 1332, 1346 (3d Cir. 1993). Because *Ventura* does not require Plaintiff's case to be transferred to a different administrative law judge on remand, it will be up to the Commissioner to decide how to proceed when the upcoming administrative proceedings commence. Nothing in this opinion, however, should be construed to preclude Plaintiff from seeking the recusal of the ALJ (or any other administrative law judge) during the course of the forthcoming proceedings if he deems it appropriate to pursue that course of action.

For all of the foregoing reasons, the parties' motions for summary judgment are denied, and the case is remanded to the Commissioner for a decision that adequately explains the medical evidence relied upon in making a determination on Plaintiff's claims.

An appropriate Order follows.

BY THE COURT:

March 31, 2010

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:    All counsel of record

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM JACKSON,                         )
                                         )
                    Plaintiff,           )        CIVIL ACTION NO. 3:08-220
                                         )
v.                                       )
                                         )        JUDGE KIM R. GIBSON
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

## ORDER

AND NOW, this 31st day of March 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.  Defendant's Motion for Summary Judgment (Document No. 13) is **DENIED.**

2.  Plaintiff's Motion for Summary Judgment (Document No. 11) is **DENIED** insofar as it seeks an award of benefits and **GRANTED** insofar as it requests a remand for further proceedings not inconsistent with this opinion.

3.  The Clerk will docket this case as closed.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:   all counsel of record

25